782 P.2d 1174

**RECREATION CENTERS OF SUN CITY, INC., a nonprofit corporation, Plaintiff–Appellee,**

v.

**MARICOPA COUNTY, a body politic, and the Arizona Department of Revenue, Defendants–Appellants.**

**No. CV–87–0087–PR.**

Supreme Court of Arizona, En Banc.

Nov. 2, 1989.

Reconsideration Denied Dec. 12, 1989.

Evans, Kitchel, & Jenckes, P.C. by James R. Hienton and David J. Ouimette, Phoenix, for plaintiff-appellee.

Robert K. Corbin, Atty. Gen., and Anthony B. Ching, Sol. Gen. by Robert A. Zumoff and James D. Winter, Asst. Attys. Gen., Phoenix, for defendants-appellants.

FELDMAN, Vice Chief Justice.

Maricopa County and the Department of Revenue ("department") petition this court to review a court of appeals decision holding that a deed restriction on property owned by Recreation Centers of Sun City, Inc. ("Rec Centers") destroyed the property's value for tax purposes. *See Recreation Centers of Sun City, Inc. v. Maricopa County*, 162 Ariz. 277, 782 P.2d 1170 (App.1986). We granted review because issues pertaining to the proper method of assessing use restricted property are of

statewide importance. *See* Rule 23 Ariz. R.Civ.App.P. 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–120.04.

## I. FACTS

Prior to 1961, Del E. Webb Development Company ("Webb") commenced the development of Sun City, a large, adult retirement community located northwest of Phoenix. Webb built various recreational facilities as part of the development. The record indicates that Webb had a consistent policy of conveying the recreation property to the homeowners' organization as phases of the development were completed. *See* Warranty Deeds, Exhibits 1–6.

Webb conveyed the six parcels of land at issue ("property") to Rec Centers with the following restrictive covenant:

[S]aid property shall be used only for the purposes presently set forth in the articles of incorporation of the grantee [Rec Centers] herein, i.e., said property shall be used for the purpose of operating and maintaining a community center and recreational facilities without pecuniary gain or profit, for the benefit of property owners in Sun City, Maricopa County, Arizona.

*Id.* Rec Centers is a nonprofit, homeowners corporation.

The properties at issue have various improvements, including recreation center complexes (each consisting of a swimming pool, social and meeting halls, auditorium, craft room, and other facilities), golf courses with pro shops, and a bowling alley. Rec Centers owns and operates all the facilities.

Sun City homeowners may become members of Rec Centers and obtain the right to use the recreational facilities by signing a facilities agreement and by paying annual dues. Articles of incorporation and by-laws govern the rights and obligations of members. Any Sun City homeowner may enforce the covenant if Rec Centers attempts to use the property in a manner inconsistent with the restriction. Pretrial Statement, filed Nov. 19, 1984.

## II. PROCEDURAL HISTORY

### A. The Trial Court

The county assessor determined that the value of the property owned by Rec Centers was in excess of $11 million for the year 1981 and in excess of $12 million for 1982. He based the value of the land on sales of comparable commercial property without deed restrictions and used a cost basis to value the improvements.

Rec Centers challenged the 1981 and 1982 valuations in the board of tax appeals.[1] Upon receiving adverse decisions from the board, it properly filed appeals in superior court that were consolidated by stipulation of the parties.

At trial, Rec Centers stipulated to the trial court that "if the property is to be valued without regard to the restriction, the values placed on it by the public authorities are the values to be followed in this case." Reporter's Transcript (RT), Nov. 20, 1984, at 5. The trial court suggested that the department stipulate that "[i]f the property is to be evaluated on a restricted use [the department had] no evidence that it [had] any value at all." *Id.* at 6. The department agreed to Rec Centers' stipulation, but had reservations about the court's suggested addendum. The in-court dialogue is confusing, at best, but apparently the department agreed that the restricted property could be deemed valueless if Rec Centers made an offer of proof or adduced testimony that would so prove. *Id.* at 7. What this meant we cannot tell; it is possible to conclude from the record, however,

---

1. Rec Centers had first challenged the department's valuation in 1980. *See Recreation Centers of Sun City, Inc. v. Maricopa County,* No. 1 CA–CV 6476 (Ariz.Ct.App. Nov. 25, 1983) (memorandum decision) (*Rec Centers I*). The court of appeals eventually determined that Rec Centers had not proven that the valuation was invalid. In the current case, Rec Centers introduced the 1983 court of appeals' decision in the trial court (Exhibit 7) and cites to it to support part of its statement of facts. The state makes no objection to this, and therefore we do not consider whether the rules of evidence permit a party to establish facts by reference to non-adjudicated facts mentioned in a decision pertaining to a previous legal action between the parties.

that the department did not agree that the property was valueless. The department stated, and the trial court agreed, that Rec Centers had the burden of going forward with the evidence.

Rec Centers introduced testimony from two witnesses who claimed the property had no value because the restrictions rendered it unmarketable. The department presented no witnesses. Finding the property to be valueless, the trial court concluded that Rec Centers was entitled to recover all taxes paid on the six parcels for 1981 and 1982. The department appealed.

### B. The Court of Appeals

The court of appeals affirmed, stating "that when the deed restriction is considered, the property has no value for tax purposes." 162 Ariz. at 281, 782 P.2d at 1174. The court rejected the department's argument that because the original owners voluntarily imposed the restriction it should be treated like any other voluntary encumbrance, for example, a lease or mortgage, and consequently be ignored. Acknowledging that it is well settled in Arizona that leases and mortgages will not be considered when determining market value for purposes of taxing real property, the court declined to apply the same rule to a deed restriction that "permanently encumbers the title to the property and severely restricts its use." 162 Ariz. at 280, 782 P.2d at 1173.

We granted the department's petition for review. We must therefore decide whether the assessor's failure to consider the deed restriction resulted in an excessive valuation and whether the trial court and court of appeals were correct in holding that, considering all the terms of the restriction, the property had no value for tax purposes.

### III. DISCUSSION

#### A. The Property Tax

##### 1. *Constitutional Considerations*

Our constitution states that "[t]he power of taxation shall never be surrendered, suspended, or contracted away." Ariz. Const.

art. 9, § 1. Such power is to be exercised for the public good. *Id.* Indeed, "the object of taxing property is to produce the revenues with which to conduct the business of the state...." *State v. County of Maricopa,* 38 Ariz. 347, 350, 300 P. 175, 176 (1931). Accordingly, only specific property may be exempt from taxation. Ariz. Const. art. 9, §§ 2, 2.1, 2.2, and 2.3. The purpose of these constitutional provisions is to ensure that all property in the state bears "its just burden of the taxes." *Brophy v. Powell,* 58 Ariz. 543, 554, 121 P.2d 647, 652 (1942).

 Legislative tax exemptions that force other taxpayers to bear increased tax burdens must foster legitimate social goals and comply with constitutional provisions. *See* Comment, *Real Property Exemptions in Arizona,* Law & Soc. Order 241 (1972). Therefore, the legislature may not exempt from *ad valorem* tax any property or class of property not specified in the constitution, and any law exempting property from taxation is to be strictly construed. *Kunes v. Samaritan Health Serv.,* 121 Ariz. 413, 590 P.2d 1359 (1979). The legislature's policy is that "all property in this state shall be taxed, excepting only the classifications permitted by the constitution." *See* A.R.S. § 42–271(A)(1) to (17). Rec Centers' property does not fall within any of the permitted exceptions.[2]

Of course, the arguments in this case are not based on a legislatively granted, constitutionally permitted exemption. However, unless the property actually has no value, its zero assessment effects a *de facto* exemption that reduces the state's ability to raise revenue. Thus, in turning to analyze the effect of the deed restriction, we bear in mind the policy of the constitution: all property not exempted must bear its share of the tax burden.

##### 2. *Valuation: The Statutory Scheme*

 When imposing property taxes, the assessor must consider the property's full

---

2. The legislature has carved out specific exemptions, including those for certain charitable enterprises, in the taxation scheme. *See* A.R.S. § 42–271. We find no indication in the general scheme that the legislature meant to exempt all nonprofit organizations. There is no suggestion that we deal here with an eleemosynary enterprise. A private golf course is not a public park.

cash value, the assessment ratio, and the tax rate. *See* A.R.S. §§ 42–201(1), 42–227, and 42–304. In arriving at an accurate full cash value, the assessor is required to determine market value. A.R.S. § 42–227. Market value is synonymous with "full cash value" and is "that estimate of value that is derived annually by the use of standard appraisal methods and techniques or as provided by law." A.R.S. § 42–201(4). Thus, property may be valued by the market data, cost, or income approach. *County of Maricopa v. Sperry Rand Corp.*, 112 Ariz. 579, 581, 544 P.2d 1094, 1096 (1976).

█ A taxpayer may challenge the department's assessment in superior court. A.R.S. § 42–178. The trial court, however, may not make an independent evaluation of full cash value until the taxpayer presents evidence to rebut the statutory presumption that the valuation is correct. A.R.S. § 42–178(B) ("The valuation or classification as approved by the appropriate state or county authority shall be presumed to be correct and lawful"); *Department of Property Valuation v. Trico Elec. Coop., Inc.*, 113 Ariz. 68, 546 P.2d 804 (1976). The trial court must determine that the valuation is either excessive or insufficient before it makes its own evaluation. *Id.*

The trial court in the present case considered the testimony of Rec Centers' witnesses regarding the value of the property on the open market. One witness was the manager of a real estate brokerage firm, the other the manager of a realty appraisal firm. Addressing only the property's value in the marketplace, they testified that the deed restriction quoted above destroyed marketability. In their opinion, no one would buy property that could not be operated on a for-profit basis. Based on the testimony that the property was not marketable while subject to the deed restriction, the trial court found the valuation excessive and concluded that the property had no value for tax purposes. *See* Find-

ings of Fact, Conclusions of Law, filed Jan. 29, 1985.

**B. The Arguments Under Arizona Case Law**

1. *The Department's Argument: The Effect of Leases and Mortgages*

█ The department contends that deed restrictions should be treated like leases and mortgages and ignored for valuation purposes. Under established Arizona law, property burdened by long term leases or mortgages is not appraised at its potentially restricted selling price, but is compared to similar property without such burdens. *See Steinfeld v. State*, 37 Ariz. 389, 294 P. 834 (1930); *Magma Inv. & Dev. Corp. v. Pima County*, 128 Ariz. 291, 625 P.2d 354 (Ct.App.1981); *Caldwell v. Dept. of Revenue*, 122 Ariz. 519, 596 P.2d 45 (Ct.App. 1979). Even if such encumbrances make a particular property more or less desirable to a prospective buyer, the assessed value for tax purposes is not affected. *Caldwell*, 122 Ariz. at 521, 596 P.2d at 47. This rule obtains despite the obvious fact that such encumbrances affect the price the owner could obtain in the market. *Id.*[3]

The court of appeals declined to apply the rule for leases and mortgages, believing it premised on mere pragmatic considerations: "If the assessor were required to consider leases and mortgages in his calculations, the difficult business of fixing value would be rendered even more complex." 162 Ariz. at 280, 782 P.2d at 1173. The majority of courts, however, has chosen to disregard the effect of leases and mortgages for more important reasons than the fear that the calculation would be too complex for the assessor. J. Youngman, *Defining and Valuing the Base of the Property Tax*, 58 Wash.L.Rev. 713, 718–19 (1983). Such encumbrances are ignored because taxes are assessed only against the property; "[t]he basis for [disregarding the

---

**3.** For instance, a property encumbered with an 18% mortgage and no prepayment privilege might sell for much less on the present market than the identical property encumbered by the same mortgage with a prepayment clause. A similar argument can be made with respect to

the cash flow resulting from long term leases. Commercial property encumbered by a long term lease without percentage rental or inflation provisions is generally worth much less than the identical property with such provisions.

effect of leases] is that the tax is levied upon the land and is a tax upon all the interests into which the land might be divided...." *Swan Lake Moulding Co. v. Department of Revenue*, 257 Or. 622, 478 P.2d 393, 395 (1970) (cited in *Caldwell*, 122 Ariz. at 521, 596 P.2d at 47, to support holding that leases do not affect full cash value for tax valuation). Thus, because the tax is against the property itself, the fee owner's personal financial status is irrelevant. Youngman, *supra*, 58 Wash.L.Rev. at 719. The assessor is not concerned with whether the owner has borrowed funds to purchase the property, whether the owner has permitted a good or bad tenant to occupy it, or whether the owner's business operation is profitable or unprofitable. *See generally id.* and cases cited therein.

### 2. Rec Centers' Argument: The Effect of Easements on Valuation

Rec Centers argues that the deed restrictions should be treated like easements and thus be considered in the assessed value of all Sun City property. *See Arizona R.C. I.A. Lands, Inc. v. Ainsworth*, 21 Ariz.App. 38, 41, 515 P.2d 335, 338 (1973); 1 J. Bonbright, Valuation of Property 496–97 (1937); Restatement of Property § 509 (1944). This argument is based on the testimony of one of Rec Centers' witnesses that the right to use the recreational property had enhanced the value of the Sun City homeowners' properties and had induced potential buyers to purchase homes in what had been an otherwise unattractive area at some distance from Phoenix. Thus, Rec Centers argues, the value of the recreational property has "flowed through" and is reflected in the value of the Sun City properties.

The court of appeals was persuaded by this theory and held that the deed restriction was similar to a recorded easement that burdens one property and benefits another. 162 Ariz. at 281, 782 P.2d at 1174; *see also Ainsworth*, 21 Ariz.App. at 41, 515 P.2d at 338. Thus, the court concluded the value of Sun City property was enhanced by the right to use Rec Centers' property. But Rec Centers introduced no specific evidence or market data concerning the amounts by which residential property within Sun City was increased in value because of a right to use Rec Centers' property. The testimony of the witness was nothing more than his conclusion that the value of residential property in Sun City had been benefited to an unspecified degree by the proximity to and availability of the recreation property owned by Rec Centers.

We note that to prove an increase in value of the homeowners' properties, Rec Centers would have to overcome a number of obstacles. First, each member of Rec Centers is burdened with the obligation of contributing to Rec Centers' maintenance. The effect of that burden as weighed against the benefit of membership is speculative; the record is silent respecting the value of the use of Rec Centers' facilities as offset by the homeowners' payment of monthly dues. Second, if Rec Centers wished to rely on its claim that Webb increased the price of Sun City homes to offset its improvement cost, it should have demonstrated that the increase made the homes more valuable than any other home in an equally desirable location in the vicinity. Purchasers of Sun City properties may have had other reasons for locating in the area, such as the atmosphere of a retirement community or the proximity of medical care or convalescent homes. Third, Rec Centers had to show how each of the homes benefited from the exclusive use-availability of the facilities.[4] This case differs from others cited by Rec Centers in which the property at issue was surrounded by a discrete number of homes that had

---

**4.** Furthermore, we are not convinced on this record that the use is exclusive to Sun City homeowners. The deed restrictions limit the land to recreational use *for the benefit of Sun City homeowners* and in accordance with Rec Centers' original by-laws. If the sale of additional memberships to individuals outside of Sun City would enable Rec Centers to run more efficiently, arguably Rec Centers could open its membership to individuals outside of Sun City. Without the benefit of the original by-laws in this record, we have no way to determine if the right of use is indeed exclusive.

the exclusive privilege of use of the recreational area. We are here confronted with an entire community.

Moreover, even granting that the conclusion is correct, and property located near a golf course, with the right to use the course for a fee, may be worth more than similar property that has no such right,[5] we fail to see the relevance of this point. The question is not the assessed value of all Sun City residential property but rather the value of the recreational properties.

■ Nor does case law support Rec Centers' "flow through" theory. The property burdened with an easement must be valued for tax purposes as its *use* is affected by the easement, just as the property benefited by the easement must be valued as its *use* is enhanced by the easement. *See Alvin v. Johnson*, 241 Minn. 257, 63 N.W.2d 22, 26 (1954). A similar arrangement existed in *Locke Lake Colony v. Town of Barnstead*, 126 N.H. 136, 489 A.2d 120 (1985) (restrictions on the use of a property, incorporated in the deeds and by-laws of a homeowners' association, created a right akin to an easement; held that the assessor had properly added the value of the servient estates to the value of the dominant estates).[6]

Rec Centers has not offered evidence that the restriction created a quantifiable increase in value in any specific Sun City property. The taxable value of the servient property cannot merely evaporate, and the likelihood of even an actual easement rendering a servient property valueless is remote. *See Lake County Bd. of Review v. Property Tax Appeal Bd.*, 91 Ill.App.3d 117, 46 Ill.Dec. 451, 414 N.E.2d 173 (1980) (simply because property benefits others does not mean the property has no value); *In re Appeal of Neptune Township*, 86 N.J.Super. 492, 207 A.2d 330 (1965) (even land subject to severely limited uses has some value—but that valuation should be determined on the basis of the restricted use).[7]

Undoubtedly the restrictions in question affect value even if an easement has not been created. Thus, the question is whether the specific effect of the restrictions must be recognized by the assessor, and, if so, in what manner.

### C. The Deed Restrictions

Although the court of appeals based its decision on the deed "restriction" imposed, we believe two deed restrictions exist: one that requires the owner to operate the facility on a nonprofit basis for the benefit of Sun City homeowners, and one that limits the use of the property to recreational purposes.

---

5. It is important to distinguish between increase in value because of proximity to the golf courses, a factor that would generally affect all neighboring property, and increase in value because of ownership of a right of use over a servient tenement. It is also true, no doubt, that the degree of enhancement would depend on the amount of the monthly fee that must be paid to support the facility. The record is silent on these points.

The dissent, *post* at 293, 782 P.2d at 1186, seems to resurrect the same "double taxation" theory that the trial court dismissed on *res judicata* grounds. *See* Order, filed Oct. 10, 1984 ("Granting Defendants' Motion to Dismiss in respect to causes of action ... based on the theor[y] of ... double taxation."). The *res judicata* holding was based on *Rec Centers I*, where the court stated that:

the residents of Sun City pay tax on their property and Recreation Centers pays taxes on its property. As these properties are different, no double taxation exists.

Slip op. at 10.

6. For a discussion and criticism of the principle of equivalency—that the value of an easement should be ascertained, added to the assessment of the dominant tenement, and subtracted from the assessment of the servient—*see* Youngman, *supra*, 58 Wash.L.Rev. at 775. We need not concern ourselves with the difficult problem presented by this theory for the simple reason that as far as this record shows, Rec Centers does not even claim that the assessor has ever made the attempt to follow this procedure.

For this reason, we believe the dissent's reliance on *Locke Lake* and *Supervisor of Assessments of Anne Arundel County v. Bay Ridge Properties, Inc.*, 270 Md. 216, 310 A.2d 773 (1973), is misplaced.

7. An easement may significantly enhance the value of the dominant parcel and have little or no effect on the value of the servient tenement. Thus an evaluation based on an equivalent gain or loss may be illogical and unrealistic. *See* Youngman, *supra*, 58 Wash.L.Rev. at 775.

## 1. The Nonprofit Restriction and the Lack of Marketability

■ The nonprofit restriction for the benefit of Sun City homeowners affects the financial operation of the owner's business, but does not impact the type of use to which the property may be put. The essence of Rec Centers' argument is that the value of the recreational property has been transferred to those who have the right to use it while denying the owner a profit. The property tax, however, is levied upon the land itself and not the *interests* in the land or its profitability. *See Carlson v. Assessment Appeal Bd. I*, 167 Cal.App.3d 1004, 213 Cal.Rptr. 555, 559 (1985) (deed restriction ignored; separate legal interests in property do not affect manner of assessment, therefore "it is not the profitableness of the property to the present owner" that is relevant so long as property itself has value); *Lake County* (where the owner is not exempt, tax is on value of property, not the value of the owner's interest); *In re Neptune Township* (where witnesses testified that property could not be sold and thus had "zero" value, deed restriction—including provision prohibiting profit—should be ignored because "[t]he law requires an assessment of the value, not of the owners' title, but of the land; the assessed value represents the value of all interests in the land"); *Swan Lake Moulding* (long term leases); *Hoover v. State Bd. of Equalization*, 579 S.W.2d 192 (Tenn.App.1978) (for property tax purposes, value attaches to the property itself, not to the interest of the party in possession, thus alienation restrictions preventing sale were not to be considered in assessing value).

This court, too, has recognized the general principle that the tax is levied against the property and not the owner when deciding a case involving the interest of an adverse possessor. We stated:

> The owner does not owe the tax levied against his property. The whole proceeding to collect taxes is in rem. Under our system, it is the property that owes the tax, and not the owner.

*Santos v. Simon*, 60 Ariz. 426, 429, 138 P.2d 896, 897 (1943).

■ As a pragmatic matter, property that may be used only for nonprofit purposes does, in the "real world," have value. Standard real estate practice permits the appraiser to value the property of nonprofit organizations to determine appropriate mortgage loans. *See* Encyclopedia of Real Estate Appraising 614 (1959). The appraiser deems property similar to the one at issue (country clubs) as a "special purpose" property. *Id.* Generally, such properties operate on a nonprofit basis. *Id.* The appraiser ignores the nonprofit status in making his evaluation. The fact that the property has enough value to satisfy a lender, despite its owner's nonprofit status, is probative of its value for tax purposes.

The nonprofit limitation for the benefit of Sun City residents does not destroy the value of the property. The holder of title, Rec Centers, may share the value of the land's use with those having the right to enforce its use on a nonprofit basis. This does not make the land valueless; it merely divides its value between the operator/owner and those having the right to use it. The tax, however, is on the total value of the land, not on the fractional personal interests that share its value. *See Santos, Lake County, In re Neptune Township, Hoover.*

Arizona courts have specifically addressed challenges to tax valuation by nonprofit enterprises. *See Graham County v. Graham County Elec. Coop., Inc.*, 109 Ariz 468, 512 P.2d 11 (1973). In *Graham County*, as in the present case, the trial court accepted the taxpayer's low valuation of the property. This court held that the appraiser's use of the income approach was improper because the taxpayer was a nonprofit corporation that set its rate with the deliberate intention of not making a profit. We noted that the task of establishing value for some property is difficult but declined to hold that simply because property was not saleable, it had no cash value. *Id.*[8]

---

**8.** *See also Lake County* (private lake for exclusive use of property owners' association had value despite deed restrictions reverting property to grantor if owner sold rights); *Mashpee*

This brings us, finally, to the question of marketability. Rec Centers insists that the assessor must consider the "realities of the market place" and may not "create a mythical sale in accordance with the definition of market value." Appellee's Answering Brief at 10 (citing *Department of Revenue v. Transamerica Title Ins. Co.,* 117 Ariz. 26, 29, 570 P.2d 797, 800 (1977)).

■ We believe this argument confuses the concept of marketability with that of value. The statutes do not impose a tax on "market value" but on "full cash value." They equate full cash value with market value (*see* A.R.S. § 42–227(A)), but provide that any of the standard appraisal methods may be used in the determination, thus contemplating that where market value is not the best indicator of value, other approaches, such as a cost or income approach, may be used to fix value. *See* A.R.S. § 42–201(4). Thus, although a particular restriction may destroy marketability, the property may have value in use to the owner and should therefore be assessed and taxed. Arizona has recognized this principle. *See Sperry Rand,* 112 Ariz. at 581, 544 P.2d at 1096 (special purpose building with little or no value on the market but having great value in use to the owner should not be assessed by use of the market technique but, instead, by a cost less depreciation method); *Graham County* (use of income approach improper, because taxpayer was nonprofit electric cooperative).

These principles have been long recognized in states other than Arizona. *See New York Stock Exch. Bldg. Co. v. Cantor,* 221 A.D. 193, 223 N.Y.S. 64 (1927), *aff'd mem.,* 248 N.Y. 533, 162 N.E. 514 (1928) (stock exchange building, which could be used only by stock exchange, had no value on the market and was to be assessed at reproduction cost less depreciation; owner's argument for zero valuation rejected); *see also Equitable Life Ins. Co. v. Board of Review,* 281 N.W.2d 821 (Iowa 1979) (when market value cannot be determined by sales price, "other factors" approach is to be used); *Joseph F. Seagram & Sons, Inc. v. Tax Comm'n,* 18 A.D.2d 109, 238 N.Y.S.2d 228 (1963), *aff'd,* 14 N.Y.2d 314, 251 N.Y.S.2d 460, 200 N.E.2d 447 (1964) (Seagram's building, designed and built as an architectural landmark, on completion was worth on the market only one-half its construction cost; nevertheless, it should be valued at cost of construction and not market value). These cases all stand for the proposition that property that has little or no marketability may still be of great value in use to the owner and must bear its "just burden of taxes." *Brophy,* 58 Ariz. at 554, 121 P.2d at 652.

The restriction to use by Sun City homeowners presents a similar issue. A restriction to beneficial use by a limited number of people does not affect the *manner* in which the land may be used; rather, it limits the class of *individuals* entitled to use the land. It does not limit the value of

---

*Wampanoag Indian Tribal Council, Inc. v. Assessors of Mashpee,* 379 Mass. 420, 398 N.E.2d 724 (1980) (where there is no right in the ordinary sense to sell the assessed property, the words fair cash value must be given a more elastic significance); *NeBoShone Ass'n v. State,* 58 Mich.App. 324, 227 N.W.2d 358 (1975) (restriction of sale of an interest in forest land did not affect value of property); *In re Neptune Township* (private beach had value despite deed restriction that prevented sale of property).

Rec Centers cites cases in other jurisdictions where taxpayers were allowed to show that deed restrictions limiting profitability reduced the property's taxable value. None of the cases used the taxpayer's nonprofit status as the gravamen of its holding. *See, e.g., Supervisor of Assessments; Mashpee Wampanoag; Lodge v. Inhabitants of Swampscott,* 216 Mass. 260, 103

N.E. 635 (1913); *Tualatin Dev. Co. v. Dept. of Revenue,* 256 Or. 323, 473 P.2d 660 (1970); *Sahalee Country Club, Inc. v. State Bd. of Tax Appeals,* 108 Wash.2d 26, 735 P.2d 1320 (1987); *Twin Lakes Golf & Country Club v. King County,* 87 Wash.2d 1, 548 P.2d 538 (1976).

The dissent relies primarily on *Dotson v. Henry County Bd. of Tax Assessors,* 155 Ga.App. 557, 271 S.E.2d 691 (1980), *Lochmoor Club v. City of Grosse Pointe Woods,* 10 Mich.App. 394, 159 N.W.2d 756 (1968), *Boston Edison v. Board of Assessors,* 387 Mass. 298, 439 N.E.2d 763 (1982), and *Swampscott.* These cases all dealt with restrictions that affected the use to which the property could be put, not the nonprofit status of the owner. As we hold in this opinion, the restriction to recreational use must be considered by the assessor. *See post* at 290, 782 P.2d at 1183. We find the other cases cited in the dissent unpersuasive.

the land as land but only divides or assigns the value as between a specified class of owners. We do not believe either the framers of our constitution, or the legislature that implemented its provisions in mandating that all property be taxed, contemplated that such a limitation would provide an exemption or reduction of taxes. If Webb wished to create a *private* park for the benefit of homeowners in its development, that private park must nonetheless bear its burden of taxation.

█ Thus, we conclude that from the standpoint of valuation for tax purposes, the nonprofit restriction for the benefit of Sun City homeowners does not affect the value of the property. It may divide its value in use between the owner and those having the right to use it, but the tax is on the property as a whole and not on any fractionalization of the owner's interest or profits. The restriction may indeed turn the property into a special purpose property, of limited marketability, but one nevertheless valuable and subject to tax despite the owner's inability to sell it. The restriction to nonprofit status is a personal interest that actively affects the value of the owner's title; therefore, it cannot provide an exemption neither sanctioned by the legislature nor permitted by our constitution. The voluntarily imposed restriction, actually made for the overall benefit of the commercial enterprise, cannot be permitted to remove valuable property from the tax rolls. We hold that the assessor may not consider the restrictions limiting profitability or the class of users to be benefited in determining the assessed value of the property.

2. *Restriction to Recreational Use*

█ Our conclusion regarding the nonprofit restriction does not preclude the assessor from considering the effect of the portion of the restriction that limits the use of the land to recreational activity. The restriction to recreational use does not divide value between different users but affects the value of the whole property. Just as with zoning and subdivision restrictions that limit the use of land, the recreational use restriction has an undoubted effect on value, whether the value be measured by any appraisal method. *See* A.R.S. § 42–141(A)(5). The property cannot be valued as if it were property to be used for residences, apartments, retail stores, or industry; the land is not and cannot be so used even though it may be now properly located and zoned. The limitation on use does not divide value between those who have the right to use; it limits the value in use of all users. We deal with golf courses and bowling alleys, not industrial parks.

The department must consider "current usage" when valuing property. A.R.S. § 42–141(A)(5); *Golder v. Dept. of Revenue*, 123 Ariz. 260, 599 P.2d 216 (1979);[9] *see also Lochmoor Club v. City of Grosse Pointe Woods*, 3 Mich.App. 524, 143 N.W.2d 177 (1966) (assessor erred in valuing property for residential use when he ignored restriction to country club and park purposes). Whatever the approach to valuation, the department must therefore consider the recreational use.[10]

## IV. CONCLUSION

Deed restrictions limiting the profitability of an owner's use of the property or the class of permitted users are personal in nature. They divide the value between owner and user. They may create special purpose property and destroy marketability, but they do not destroy value. Therefore, the assessor may not consider them when valuing property; limitations on marketability of land that has value in use do not justify removing property from the tax rolls.

**9.** *Golder* uses language that seems to add the word "only" after "consider." The statute (A.R.S. § 42–141(A)(5)) uses only the word "consider," not the phrase "consider only." The department does not raise the issue, and therefore we do not address it.

**10.** We note the legislature has recently turned its attention to properties dedicated to golf course use and has mandated that beginning in 1987 "the land shall be valued without any allowance for urban or market influences." *See* A.R.S. § 42–146. We do not address this statute at this time.

Land use restrictions, on the other hand, affect the inherent value of the land as an entire property in use. Limitations restricting use to recreational activities therefore must be considered in the valuation formula. The assessor may utilize any appraisal approach or hybrid method of appraisal that takes the principles explained in this opinion into consideration.

The judgment is reversed. The opinion of the court of appeals is vacated. Given the ambiguous nature of the stipulation made by the parties, the case is remanded to the trial court for proceedings not inconsistent with this opinion.

GORDON, C.J., and MOELLER and CORCORAN, JJ., concur.

CAMERON, Justice, dissenting.

Because the majority has held that "the assessor may not consider the restrictions limiting profitability or the class of users to be benefitted in determining the assessed value of the property," I must dissent.

In this case, the majority has correctly stated Arizona taxation principles, but has ignored the practical reality of how the non-profit use restriction affects fair market value. Market value is defined as "the highest price estimated in terms of money which the property will bring if exposed for sale in the open market allowing a reasonable time to find a purchaser who buys with knowledge of all the uses to which it is adapted and for which it is capable of being used." *Department of Revenue v. Transamerica Title Ins. Co.*, 117 Ariz. 26, 28, 570 P.2d 797, 799 (App.1977). The test for market and taxable valuation is one that takes into account what a willing buyer would pay a willing seller in an arms-length sale of the property.

In order for Recreation Centers to successfully challenge the assessment, it must prove that the assessment is excessive and present evidence from which the trial court can determine the full cash value of the property. *Graham County v. Graham County Electric Co-op. Inc.*, 109 Ariz. 468, 469–70, 512 P.2d 11, 12–13 (1973). Full cash value is synonymous with market value. A.R.S. § 42–201(4).

If the property has no market value, then it has no cash value and should not be taxed. We recognize that the property in question, which includes recreational facilities, social and meeting halls, golf courses, etc., seems to have intrinsic "value." However, the issue here is does it have market value? If the use of the land is so restricted that its ownership is of no value, assessment for tax purposes should be nothing. *Twin Lakes Golf and Country Club v. King County*, 87 Wash.2d 1, 3, 548 P.2d 538, 540 (1976). Here, the recreational facilities cannot be run for a profit. Recreation Centers has presented evidence through expert testimony showing that the property does not have a fair market value.

*Mr. Blakey:* "[I]f a purchaser is presented a piece of property that has no upside potential, that is, he will not realize any income, then the property is of no value. And this appears to be the situation here. It's not for profit. The use is perpetual as far as what can be done with the property. There's no change possible. So there's no development potential for the property."

\* \* \* \* \* \*

Q. [By Mr. Segall]: In your opinion is [the property] marketable?

A. [By Mr. Blakey]: No.

Q. In the real world of sales of property, fair market value, willing buyer, willing seller, what is the fair market value in your opinion of this property?

A. There is no fair market value. Nobody's going to buy this property.

Another expert, Mr. Howarth, echoed Mr. Blakey's testimony.

Q. [By Mr. Segall]: What is your opinion [as to the deed restrictions' effect on market value]?

A. [By Mr. Howarth]: My opinion is it would have no marketability.

Q. How does the lack of marketability relate to fair market value as you have defined it?

A. In this case the property would have, in my opinion, with that clause in it, no effective market value because it could not be readily sold.

Q. What is the reason for your opinion?
A. Basically that this type of property cannot be operated for a profit so some willing buyer, if there was such an item or a person interested in buying it is a better way to put it, I don't see in my opinion why they would purchase it with no profit incentive. All they could make is their expenses and certainly that doesn't motivate people to buy property that is being used for services to third parties.

In the absence of evidence to the contrary, this testimony is sufficient to overcome the presumption that the tax assessor's valuation was not excessive. *See O'Donnell v. Maves*, 103 Ariz. 28, 32, 436 P.2d 577, 581 (1968) (uncontradicted evidence may not be arbitrarily rejected by trier of fact, especially when corroborated by a disinterested witness).

The state's assessment of the property is based on the fiction that the property does not bear any restrictions. However, I cannot accept the use of such fictions. I agree with the court of appeals in *Department of Revenue v. Transamerica Title Ins. Co.*, in which it stated:

> The appraiser attempts to create a mythical sale in accordance with the definition of market value. However, although the sale may be mythical, this does not mean that the appraiser can use pure fiction in arriving at its value. He must face the realities of the marketplace.

117 Ariz. 26, 29, 570 P.2d 797, 800 (App. 1977).

The majority holds that deed restrictions should not be considered at all. I do not believe this to be sound law. Several other courts have concluded that it is logical and equitable to take deed restrictions into account when assessing the value of property. In *Dotson v. Henry County Bd. of Tax Assessors*, 155 Ga.App. 557, 271 S.E.2d 691 (1980), *enforced by* 161 Ga.App. 257, 287 S.E.2d 696 (1982), the court remanded the case because the tax assessors had erroneously over-valued a restricted use flood plain that comprised a significant por-

tion of the land being appraised. The court said that the assessor should have "first determin[ed] the criteria for zoning, existing use, and *deed restrictions*, if any, at which time other pertinent factors may be considered." *Dotson*, 155 Ga.App. at 559, 271 S.E.2d at 693 (emphasis added).

Similarly, in *Boston Edison Co. v. Bd. of Assessors*, 387 Mass. 298, 439 N.E.2d 763 (1982), the court said, "If the property is known to be subject to a *deed restriction* or to a governmentally-imposed restriction affecting its value or its *earning power*, that fact should be considered in any determination of its fair cash value." *Id.* at 304, 439 N.E.2d at 767 (emphasis added). *See Lochmoor Club v. City of Grosse Pointe Woods*, 10 Mich.App. 394, 159 N.W.2d 756 (1968) (case required tax commission to determine the extent of the effect of the use restrictions upon the value of the parcels to which they are applicable).

Thus, while the mere existence of deed restrictions may not necessarily render the property valueless, they should be considered.

In the present case, the property will *never* operate at a profit because profit is forbidden by the deed. Moreover, expert testimony established that no one would be willing to buy the property and in all practicality, Recreation Centers' property probably could not be used as security since it is guaranteed to be unprofitable.

It strikes me as inherently inequitable to assess nonprofit recreational facilities the same as those capable of producing a profit. It ignores reason to say the two are of the same value.[11]

Support for Recreation Centers' position may be found in *Quivira Falls Community Ass'n v. Johnson County*, 230 Kan. 350, 634 P.2d 1115 (1981) and *Lodge v. Inhabitants of Swampscott*, 216 Mass. 260, 103 N.E. 635 (1913). I believe that Recreation Centers' position is supported by the logic of these two cases which the majority ignores.

---

11. This is not to say, however, that being non-profit is the same as being unprofitable. Merely operating at a loss is not equal to a deed restriction prohibiting a profit.

In *Swampscott*, the Massachusetts Supreme Court stated:

> To assess this property without regard to the restriction would ... be to assess it for an amount in excess of its fair cash value and in violation of the statute. No doubt assessors cannot be compelled to inquire into all the details affecting the title to property, but when their attention is called to matters relating to its value they are bound to pay due regard to them.

216 Mass. at 263, 103 N.E. at 636.

Similarly, in *Quivira Falls*, the Kansas Supreme Court accepted the rule that if a property were so highly restricted that no sensible person would buy it, such property would have no value for tax purposes. *Quivira Falls*, 230 Kan. at 355–57, 634 P.2d at 1120–21. In *Quivira*, the court distinguished its case from the cases announcing this rule because in all the other cases, the property had little or no value and in *Quivira* no testimony indicated that the property was without value.

The majority also overlooks the fact that the original cost of the facilities was recouped through increasing the purchase price of the residential properties served by the facilities. We cannot ignore the fact that the individual lots in Sun City have enhanced value because of these recreational facilities. Expert testimony was presented to establish that the value of the properties is increased by the restrictions, thus offsetting any loss of taxable value represented by the facilities themselves. *See Arizona R.C.I.A. Lands, Inc. v. Ainsworth*, 21 Ariz.App. 38, 515 P.2d 335 (1973) (in determining the market value of property the assessor is required to consider the additional value of the dominant estate, and the decreased value of the servient estate, resulting from the easement). Finding that Recreation Centers' property has no value for tax purposes does not exempt it from the tax rolls, it merely prevents it from appearing on the rolls twice.

Because today's decision may well force Recreation Centers to increase membership fees to pay the taxes, Sun City residents will be burdened with taxes directly through the value of their own property and indirectly through their dues that allow them to use the facilities.

The state argues that if we rule for Recreation Centers, owners of unrestricted and valuable property will subject it to irrevocable restrictions that render it valueless and unmarketable in order to avoid taxes. However, I do not see the threat to the tax base when any decrease in the value of the burdened property would be accompanied by reciprocal increases in the value of the property benefited by the restrictions.

I am not alone in this view. In *Locke Lake Colony Ass'n Inc. v. Town of Barnstead*, 126 N.H. 136, 489 A.2d 120 (1985), the property involved was a lake, a lodge, a golf course, a marina, a ski slope, ball fields, tennis courts, beaches and swimming pools. The New Hampshire Supreme Court found that the property was so encumbered with easements that it had no taxable value. The court also noted:

> The town's claim that the result in *Waterville Estates [Assoc. v. Town of Campton*, 122 N.H. 506, 446 A.2d 1167 (1982) ] will encourage taxpayers to create homeowners' associations as vehicles to avoid the payment of taxes on valuable property, and thereby deprive municipalities of tax revenues, is without merit. Municipalities will not lose significant tax revenues in cases such as the one before us, because, although "a landowner whose property is subject to an easement is entitled to a reduced valuation, the value of the easement [is] added to the estate of the dominant owner."

*Locke Lake*, 126 N.H. at 141, 489 A.2d at 123–24 (quoting *Gowen v. Swain*, 90 N.H. 383, 387–88, 10 A.2d 249, 252 (1939)).

In *Supervisor of Assessments of Anne Arundel County v. Bay Ridge Properties, Inc.*, 270 Md. 216, 310 A.2d 773 (1973), the property was a beach whose use was reserved exclusively to lot owners for nonprofit beach purposes. The Maryland court of appeals held that the proper assessment was upon the benefited lots, not the restricted property.

The combination of the grant of easements for the recreational use of the beach and the imposition of restrictions against disposition and improvements deprived the beach, as the servient estate, of whatever value it might otherwise have had. What value it had become [sic] exclusively and permanently attached to the lots....

... The easement rights in the beach, held by the owners of lots in the subdivision, enhance the values of the lots themselves, and such enhancement is directly reflected in the assessments of those properties.

*Bay Ridge,* 270 Md. at 222–23, 310 A.2d at 776–77.

Neither do I agree with the majority that such restrictions are similar to leases. Property burdened by long-term leases or mortgages is not appraised at its potential selling price, but is compared to similar property without the burdens. *Steinfield v. State,* 37 Ariz. 389, 393, 294 P. 834, 835 (1930); *Magna Investment & Dev. Corp. v. Pima County,* 128 Ariz. 291, 294–95, 625 P.2d 354, 357–58 (App.1981); *Caldwell v. Dept. of Revenue,* 122 Ariz. 519, 521, 596 P.2d 45, 47 (App.1979). I agree with the court of appeals that there is a pragmatic reason for this rule. Such restrictions are voluntarily assumed by the present owner and would make fixing the value even more complex. As the court of appeals stated, "In the case of leases, the lessor and lessee may allocate the payment of a tax among themselves, and in the case of mortgages, such may be extinguished at any time." *Recreation Centers, Inc. v. Maricopa County,* 162 Ariz. 277, 280, 782 P.2d 1170, 1173 (App.1986).

Furthermore, an encumbrance, lien, mortgage or lease on property does not necessarily increase the fair market value of the adjoining property. However, the contrary is true regarding deed restrictions. If a deed restriction is placed on property, the adjoining landowners have an enforceable interest in the subject property that would tend to increase the value of their property and would be subject to property tax.

Another reason why leases are distinguishable from deed restrictions is that the property owner has voluntarily created the lease and has retained full title to the property. *Caldwell v. Dept. of Revenue,* 122 Ariz. 519, 521, 596 P.2d 45, 47 (App.1979). Full use will revert to him when the lease expires. Contrast the present case in which the owner of the property subject to the restriction has not created the situation, will never receive a reversion, and does not retain full title to or use of the property.

An additional distinguishing factor is that if the value of a leasehold is not taxed with the fee, it will not be subject to taxation at all. *Peabody Coal Co. v. Navajo County,* 117 Ariz. 335, 339, 572 P.2d 797, 801 (1977) (no statutory authority to tax a leasehold interest.) This is not a problem with easements or deed restrictions because there is by definition another parcel of property which is benefited by the restriction and whose resulting increased value can be taxed accordingly.

Based on the case law and the evidence Recreation Centers has presented, I believe the court of appeals was correct in affirming the trial court's judgment that the tax assessor should take deed restrictions into account when valuing property for tax purposes. I would approve the opinion of the court of appeals and affirm the trial court.